# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40189**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Kristopher D. COLE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 March 2023

———————————

*Military Judge:* Brett A. Landry (arraignment and motions); Mark W. Milam.

*Sentence:* Sentence adjudged 15 June 2021 by GCM convened at Davis-Monthan Air Force Base, Arizona. Sentence entered by military judge on 19 August 2021:[1] Bad-conduct discharge, confinement for 14 months, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Abhishek S. Kambli, USAF.

*For Appellee:* Colonel Naomi P. Dennis, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH and Judge CADOTTE joined.

———————————

[1] This is the date of the military judge's electronic signature on the entry of judgment. The date listed on the top of the entry of judgment is "15 June 2021."

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

RICHARDSON, Judge:

A general court-martial comprised of a military judge convicted Appellant, in accordance with his pleas and pursuant to a plea agreement (PA), of three specifications involving assault in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2] In accordance with the PA, the convening authority withdrew and dismissed with prejudice two specifications of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920, and four other specifications in violation of Article 128, UCMJ. The military judge sentenced Appellant to a bad-conduct discharge, 14 months' confinement, reduction to the grade of E-1, and a reprimand.[3] The convening authority disapproved the reprimand and approved the remainder of the sentence adjudged.

On appeal, Appellant raises two assignments of error, claiming: (1) Appellant's trial defense counsel were ineffective "for at least six reasons," specifically when they: (i) failed to request a sanity board under Rule for Courts-Martial (R.C.M.) 706, (ii) failed to adequately investigate Appellant's traumatic brain injury (TBI) for mitigation, (iii) failed to adequately investigate the impact of Appellant's alcoholism on the charged offenses, (iv) failed to object to improper evidence and argument presented by trial counsel during presentencing, (v) presented a short sentencing argument that did not effectively lay out a case for leniency at sentencing, and (vi) advised Appellant to waive clemency on an incorrect legal basis;[4] and (2) the military judge's failure to conduct further inquiry into Appellant's TBI made his pleas of guilty improvident.

After receiving Appellant's assignments of error, the Government's answer, and Appellant's reply, this court specified two issues for the parties to brief: (3) whether Appellant's plea of guilty to Specification 2 of Charge II was

---

[2] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] The plea agreement required the military judge impose a total amount of confinement between 180 days and 18 months and prohibited the military judge from imposing a dishonorable discharge.

[4] Appellant also asserts "the cumulative effect of these errors denied [Appellant] due process of law and merits reversal." Having carefully considered issue (1), we find no relief for cumulative error is warranted under the Fifth Amendment, U.S. CONST. amend. V, or Sixth Amendment, U.S. CONST. amend. VI. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

improvident because the military judge misadvised Appellant of the nature and elements of the offense, and (4) whether Appellant is entitled to relief because the military judge misapprehended the offense in Specification 2 of Charge II for which he sentenced Appellant.

We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND[5]

At the time of the offenses, Appellant and RL were assigned to the same squadron at Davis-Monthan Air Force Base, Arizona. All the offenses occurred at Appellant's home, which he shared with three Airmen and which RL frequented. RL "liked" Appellant; however, Appellant "did not want a relationship with her, but said that he would be willing to be sexually intimate with her." "[RL] enjoyed grappling, or 'play wrestling' with [Appellant]." She would initiate these sessions with Appellant "by annoying him." If he was "wrestling her for fun," he would let her tap out—stop after she tapped him on the arm; other times, Appellant would not stop and he would "hurt her."

### A. Strangulations

Appellant admitted as fact that he strangled RL "at least five separate times." The first two times were around 14 September 2019. RL was teasing Appellant about taking his car for a drive. Appellant became angry and put RL in a chokehold from behind until she lost consciousness. During the strangulation, RL felt a burning sensation in her throat and started to panic because she could not breathe. She asked Appellant to stop multiple times and tried tapping out, but Appellant did not stop. "She thought she was going to die." When RL awoke, she found Appellant in a different room. She asked what happened, and he said, "[Y]ou passed out, so I dropped you to the floor. You woke up like two minutes later." About ten minutes later, for no apparent reason Appellant strangled RL a second time, again using a chokehold and until RL lost consciousness. "After this second strangulation, [RL] asked [Appellant] why he did that, again. He replied, '[J]ust cause.' Then elaborated, saying, 'I'm not gonna do that again cause it can cause serious brain damage.'"

Appellant strangled RL again three or four more times, however, over the course of four months, each witnessed by one or more Airmen. On one occasion, Appellant pinned RL to the ground facing him, and used his forearm to

---

[5] Prosecution Exhibit 1, titled "Stipulation of Fact," contains facts as well as expected testimony from RL and other witnesses. Unless otherwise noted, information and quotations in this section come from this exhibit and we accept any expected testimony as fact.

strangle her. After RL's face turned red, an Airman "ran over to [Appellant] and pushed on his head to get him to stop strangling [RL]." Another time, a different Airman, AW, witnessed Appellant use a chokehold to strangle RL. AW confronted Appellant, who "laughed about strangling [RL]." Witnesses said when RL "tried to tap out, [Appellant] would not let her go."

The last charged strangulation was "worse than the others." While losing to Appellant's team in beer pong, RL "was playfully upset" and Appellant got angry. Appellant put RL in a chokehold like before, but "this time it seemed like he also lifted her up, so that only the tips of her toes were still touching the ground." As stipulated by Appellant, RL thought this strangulation was more severe than the others:

> [RL] felt more pain. Her inability to breathe this time felt like if a person were to hold their breath and their face feels tight, with accumulating pressure in their face. She felt a lot of pressure in her head, and felt like her eyes were going to pop out of her face. She felt his arm squeezing on her neck and it felt like it was pulling her neck up, making it longer. This time, she passed out much quicker than the previous strangulations. [RL] would testify that in her opinion this strangulation felt worse than the others because [Appellant] employed not only a manual form of strangulation, with his forearm, but also a hanging form of strangulation, by lifting her body weight up, causing additional pressure to accumulate in her head.

RL regained consciousness, and felt a severe headache, dizzy, and confused. Appellant told RL that her face turned purple, and she had been foaming at the mouth and seizing. One Airman, WC, witnessed the strangulation and saw RL's face turn purple. Additionally, "at one point that night, [Appellant] bragged to [WC] that he had strangled [RL] to the point of passing out four to five times, assuring [WC] that [RL] would be fine that night." As Appellant stipulated, "Each time [RL] had an altered state of consciousness or lost consciousness, the risk of irreparable damage to her brain and body increased."

**B. Firearm Incident**

Appellant was a self-described "firearms enthusiast;" RL "was not familiar with firearms." About a week after the first strangulation, Appellant "handed [RL] his Kriss Vector rifle to disassemble and reassemble." RL was struggling to reassemble the rifle precisely, said she was tired, and "asked if she could just go to bed." Appellant became angry. He yelled at RL as she sat on the couch where she had been reassembling the rifle. Appellant "walked over to [RL] and held up his 9mm Smith and Wesson pistol [ ] to her temple." "He yelled, '[D]on't disrespect me in my own house, you are going to do this. My

house, my rules, you are going to finish it, that's what I told you to do!' [RL] was terrified." Unbeknownst to RL, Appellant had pulled the firing pin out of the pistol. Appellant later told one of his roommates "that he pulled the trigger when he held the pistol to [RL's] temple." Appellant told another person that "he did it to 'put pressure on [RL] and to make her go faster.'" When AW confronted Appellant about whether he really held up a pistol to RL's temple, Appellant "said he did, and said it was funny."

The weekend after the firearms incident, and between strangulation incidents, Appellant was injured in a dirt-bike accident, discussed *infra*.

## C. Shoulder Incident

In mid-January 2020, Appellant and RL were consensually grappling. After RL tapped out, "[Appellant] took her arm and elbow and twisted it behind her back." Appellant "held [RL's] arm in a 90-degree bend behind her back and he was pushing her hand into her own shoulder blade, moving her arm further upwards." The incident was "excruciatingly painful" for RL. AW was present and heard RL's shoulder make "popping and cracking noises." AW "had to jump in to stop [Appellant]." RL later obtained medical treatment for her shoulder. Before this incident, Appellant knew RL had a prior shoulder injury.

## II. DISCUSSION

### A. Allegations of Ineffective Assistance of Counsel

On appeal, Appellant asserts his trial defense counsel's performance was deficient in six ways. Specifically, he alleges his counsel (i) failed to request a sanity board under R.C.M. 706, (ii) failed to adequately investigate Appellant's TBI for mitigation, (iii) failed to adequately investigate the impact of Appellant's alcoholism on the charged offenses, (iv) failed to object to improper evidence and argument presented by trial counsel during presentencing, (v) presented a short sentencing argument that did not effectively lay out a case for leniency at sentencing, and (vi) advised Appellant to waive clemency on an incorrect legal basis. Appellant submitted a declaration in support of these claims. Based on Appellant's allegations, trial defense counsel each submitted a declaration. We consider the declarations submitted by Appellant and trial defense counsel in addressing Appellant's claims. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020). We find Appellant has not overcome the presumption of competent defense counsel.

We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense counsel's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims.

### 1. Law

The Sixth Amendment[6] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). We consider the following questions to determine whether the presumption of competence has been overcome: (1) is there a reasonable explanation for counsel's actions; (2) did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel were ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *See Gooch*, 69 M.J. at 362 (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)); *see also United States v. Akbar*, 74 M.J. 364, 386 (C.A.A.F. 2015) (applying same standard for defense counsel's performance during sentencing proceedings). When considering the last question, "some conceivable effect on the outcome" is not enough; instead, an appellant must show a "probability sufficient to undermine confidence in the outcome." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

"[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *Akbar*, 74 M.J. at 379 (omission in original) (quoting *Strickland*, 466 U.S. at 689). The burden is on the appellant to identify specific unreasonable errors made by his or her defense counsel. *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999) (citing *Strickland*, 466 U.S. at 689). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is

---

[6] U.S. CONST. amend. VI.

objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citations omitted). Counsel's advice to an accused, or counsel's "strategic" or "tactical" decision that is unreasonable or based on inadequate investigation, can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474–75 (C.A.A.F. 2005).

## 2. Additional Background and Analysis

### a. Sanity Board, Traumatic Brain Injury, and Alcohol Use

Appellant's first three contentions are related. Appellant asserts that his counsel were ineffective by failing to request a sanity board, and failing to adequately investigate and present readily available evidence regarding Appellant's TBI and alcoholism. At trial, Appellant was represented by a circuit defense counsel, Major (Maj) AB, and another military defense counsel, Maj RC.[7]

Regarding the sanity board request, Appellant argues the circumstances surrounding the crimes themselves and his cavalier attitude towards them were indicators that Appellant "may have been suffering from a mental defect that caused him not to appreciate the nature and quality or wrongfulness of his conduct." In his written declaration, Appellant states,

> While preparing for my case, I told my trial defense counsel about a dirt bike accident I had on 28 September 2019 where I suffered a head injury and was diagnosed with traumatic brain injury (TBI). After the accident[,] I did have changes in my mood to include my temper. Trial defense counsel did not mention anything to me about a sanity board.

Appellant faults his counsel for not requesting copies of his medical and mental health records, and not presenting those records pertaining to his TBI to the sentencing authority. Appellant claims that trial counsel characterized him as: "(1) someone who was arguably proud of what he did to the victim, (2) someone who wanted the victim to fear for her life, and (3) someone that twisted the victim's arm intentionally to hurt her." He claims "[a] big reason" trial defense counsel could not counter the Government's negative characterization of Appellant in sentencing argument was that "trial defense counsel did not put in the effort to conduct an investigation to answer the question of what contributed to [Appellant] committing the charged offenses." He further argues that "[t]here was a rational explanation right in front of trial defense counsel that they simply chose not to investigate."

Similarly, Appellant presumes that his counsel did not investigate his alcohol abuse because they did not present evidence of it. Appellant asserts that

---

[7] Major AB and Major RC were captains at the time of Appellant's court-martial.

"[t]he alcoholism [he] was facing combined with the circumstances that led to it provided some of that context and provided answers to the question of why a star troop with no prior history of violence would suddenly engage in violent misconduct."

In his written declaration, Appellant states that if his counsel had asked for his medical and mental health records, he would have provided them. Also, he states, "I told my trial defense counsel that I was a heavy drinker and they were aware that I suffered the dirt bike accident due to riding it while I was intoxicated."

The written declarations of Maj AB and Maj RC generally are consistent with each other on the topics of sanity board, TBI, and alcoholism. Each counsel explained their reasons for not taking the steps Appellant specifies on appeal, and the breadth of their investigation.

In his written declaration, Maj RC stated the defense team discussed the circumstances of the dirt-bike accident and its effects on Appellant and the named victim. The defense team included an expert forensic psychiatrist, who Maj RC noted "was present for [counsel's] many . . . discussions with [Appellant], including most of them closer to trial." Maj RC also stated, "Two of the main topics that were regularly discussed were alcohol use and the TBI." He explained their strategy regarding a sanity board:

> As a defense team, we did not feel as if [Appellant] did not understand the nature or wrongfulness of his actions, such that a sanity board was necessary or required. Furthermore, we doubted it would be beneficial and worried it could reveal information that could be potentially negatively used in rebuttal. When [Appellant] and his defense team discussed the accident leading to the brain injury, it felt like a way to avoid personal responsibility. He would continuously blame others with little remorse or regret.

Maj AB believed a sanity board was neither warranted nor would prove helpful. In his declaration, he highlighted that Appellant "acknowledged full memory and knowledge of his actions" and stated that from their discussions Maj AB "never felt as if [Appellant] did not understand the nature or wrongfulness of his actions, such that a sanity board would prove beneficial." He stated their expert forensic psychiatrist shared their concerns that Appellant was avoiding responsibility for the dirt-bike accident. Moreover, based on his experience as a senior litigator, Maj AB feared the sanity board report could "include thoughts on potential malingering [ ] or other misconduct." He added, "I find it strategically beneficial to have a client discuss these issues in their unsworn without getting into the complexity of mental health records."

Ultimately, Maj AB "did not believe that a sanity board would uncover any helpful information or lead to a positive outcome based on these discussions" and believed instead that one "could generate potentially harmful information."

Maj RC described their investigation into the offenses, the effects of the bike accident, and Appellant's alcohol use:

> Naturally, as part of our investigation we interviewed all relevant witnesses who witnessed firsthand the acts leading to the dirt bike accident, [Appellant's] alcohol use, and the actions [ ] to which [Appellant] pled guilty. Throughout all these interviews we did not uncover mitigating evidence about the alcohol use or TBI that we felt was going to benefit [Appellant] at trial. The witnesses were consistent that [Appellant] was the same type of person before and after the accident and that [Appellant's] actions were intentional decisions to engage in what amounted to criminal behavior. They also described a general disdain of the named victim on the part of [Appellant]. He would make it clear he did not care for her, he only allowed her to hang around so that he could engage in sexual activities with her, and he resented her for being there the day he chose to drive the dirt bike drunk. For the defense team, [Appellant's] alcohol use and potential alcoholism was aggravating given the facts in this case.

Maj AB added that none of the nearly dozen witnesses they interviewed "disclosed details pertinent to using the TBI or alcohol use in mitigation beyond how [the defense team] used it" and instead had only aggravating details to offer. Maj AB also stated that their expert forensic psychiatrist "was present for [counsel's] discussions with [Appellant] and did not feel that the TBI was mitigating or that helpful information would be uncovered by further review of additional records."

Maj AB described why the defense team limited the evidence of the alcohol use and accident leading to the TBI:

> We made the intentional decision to not over emphasize the TBI and accident caused by alcohol. We did not find it particularly sympathetic that [Appellant] injured himself after making the decision to drink and drive. We did briefly mention it because [Appellant's] facial scarring was significant and we hoped for some benefit with the military judge given the injury. Additionally, we feared much discussion of this accident would motivate rebuttal evidence that [Appellant] blamed [RL] for the accident. Our interview of [RL] revealed that she was placed into an

> inpatient mental health facility shortly after this accident for the PTSD she suffered from witnessing this accident and providing medical care to [Appellant] while waiting for an ambulance. She was medically retired due to this PTSD and other issues.

In her unsworn statement to the sentencing authority, RL did not mention witnessing the accident, any mental health diagnosis, or why she left active duty.

In his oral unsworn statement to the sentencing authority, Appellant said the following about the accident:

> Please believe me that I am not a bad person. I did make a series of bad choices. First, I got into a dirt bike accident and mistreated [RL]. As to the dirt bike accident, because of my actions, I was in a coma for nearly a week, suffered a traumatic brain injury, and had permanent scarring and hearing damage. It is true that my actions ruined my dreams and career, but they also subjected my friends to trauma. They had to see me there and hold my nearly lifeless body. To [RL], I thought about what I said for some time now, and you are not the cause or reason of my accident. I am in control of my own body and I got on that bike that night. I am sorry for that and everything.

We do not agree with Appellant's allegations that his counsel failed to adequately investigate, or failed to conduct an investigation at all. We find a reasonable explanation for their decisions not to request a sanity board, not to request Appellant's mental health and medical records, and not to emphasize Appellant's TBI and alcohol abuse.

Counsel provided reasonable explanations for their actions relating to requesting a sanity board. Neither Appellant's counsel nor his expert forensic psychiatrist observed any indicators that Appellant could not remember, understand, or appreciate the wrongfulness of his actions. Having interviewed witnesses to the charged offenses, counsel still saw no indicators that the dirt-bike accident and resulting TBI affected Appellant's mental responsibility; instead, they found more aggravating evidence. We decline to adopt a requirement for counsel to request mental health records before they can determine whether a sanity board would be warranted. Appellant has not identified anything in those records that was unknown to his counsel but would have justified a request for a sanity board. Counsel had justifiable fears that a sanity board could lead to still more aggravating evidence being uncovered, and reasonably chose not to take the risk.

Similarly, Appellant has not shown that gathering and presenting evidence of a TBI would have been helpful or resulted in a different result in his case.

Appellant has provided no evidence that his TBI affected mental responsibility. Appellant's claimed "changes in [ ] mood to include [his] temper" after the accident are a far cry from lack of mental responsibility. The records Appellant submitted with his declaration to this court do not state Appellant had a condition that would cause lack of mental responsibility at the time of the offenses. The Government did not rebut Appellant's assertions in his unsworn statement that he "suffered a traumatic brain injury, and had permanent scarring and hearing damage." Significantly, we note that Appellant did not assert either at trial or on appeal that he believes the dirt-bike accident resulted in any lack of mental responsibility for his offenses.

We also find reasonable explanations for counsel not gathering and presenting evidence of alcoholism. Appellant argues such evidence would have been mitigating in that it would explain his poor behavior. Counsel explained it instead would be seen as an excuse for his poor behavior and could have revealed his unkind attitude towards RL. Maj AB noted they believed Appellant's decision to drink and drive was "unsympathetic," that Appellant blamed RL for the resulting accident, and that RL witnessing the accident and aftermath caused her psychological harm. Appellant does not identify what evidence of his alcohol abuse and treatment was to be found in his records. The decision to minimize evidence of Appellant's alcohol abuse was well within the strategic discretion of counsel.

As Maj AB stated in his declaration, the defense team's "strategy was to accept responsibility and not appear to create excuses or blame something for [Appellant's] actions." We find this was a reasonable strategy in this case. Appellant has not overcome the presumption of competent defense counsel with respect to requesting a sanity board, and investigation and presentation of evidence of TBI and alcohol abuse.

### b. Evidence in Presentencing

Appellant asserts that trial defense counsel failed to object to two prosecution exhibits: a memorandum for record (MFR) attached to Appellant's demotion action, and an affidavit offered to rebut one of Appellant's character letters.

On appeal, Appellant briefly explains the alleged error regarding the demotion-action paperwork:

> [P]age 7 of Prosecution Exhibit 5 contains an MFR attached to a demotion action for [Appellant]. That MFR includes notes taken during a meeting with [Appellant] and his commander. That should not have been included in the document since that MFR is not part of the record of the demotion. However, trial defense counsel yet again did not object and allowed it into evidence.

In response, the Government highlighted that Appellant provided no legal support for this argument, and noted it was not aware of any legal support for the argument.

We find no merit to Appellant's allegation. Prosecution Exhibit 5 is a form entitled, "Administrative Demotion of Airmen Memorandum." Block 5 on the first page of this form addresses the personal appearance of the Airman before the commander and the commander's decision. In Appellant's case, it reads in pertinent part, "If applicable, the personal appearance was held on 24 Jan 2020. Additionally, if applicable, I included a summary of the written and/or oral matters presented, dated 24 Jan 2020, consisting of 2 page(s)." Pages 6 and 7 of Prosecution Exhibit 5 comprise a two-page memo, titled "Memorandum for Record—SrA Cole CC Personal Appearance" and dated 24 January 2020. By its language, it very clearly is the memo referenced in Block 5 of the form. We see no basis for trial defense counsel to have objected to this part of the record of Appellant's administrative demotion action.

Defense Exhibit C is a character letter from Senior Master Sergeant (SMSgt) ND. He stated he knew Appellant "for approximately 2 years in a professional capacity." He opined Appellant's "work performance ha[d] been exceptional." He noted that "[w]hen [Appellant] was moved to [the unit's] Support Section, he immediately made a positive impact." He ended the letter: "I would rate [Appellant's] rehabilitative potential as high. I believe this to be the case as evident by the personal resiliency he has shown over the course of the last year along with his superb quality of work which he has continually elevated." In rebuttal, the Government offered Prosecution Exhibit 6, an affidavit from a paralegal who was present when trial counsel interviewed SMSgt ND. The paralegal stated SMSgt ND said he did not interact with Appellant in a social setting, and Appellant did not go over the details of his case with SMSgt ND. SMSgt ND also said he knew RL, who "was [a]ffected by the alleged offenses and 'was not in a great state.'" Paragraph 5 of the paralegal's affidavit relayed what SMSgt ND said about the impact the allegation had on the unit:

> Additionally, as the assistant superintendent, SMSgt [ND] stated, "[T]his case has definitely had an impact on good order and discipline. We have a section with 90 people in it. After a case like this, we have to do our due diligence. We moved [Appellant] out of the section and [RL] had to take some time off of work. Others had to pick up the work load," or words to that effect.

Trial defense counsel did not object to admission of the affidavit.

Appellant asserts trial defense counsel should have objected to the affidavit based on the language in paragraph 5. He argues that portion was not proper

rebuttal and contained improper aggravation evidence. Regarding the latter, he states, "The problem is that paragraph 5 of that exhibit highlighted unit impact due to the fact that [Appellant] had to be moved out of the section and other people had to pick up his workload."

Because the affidavit was admitted without objection, we do not know the Government's theories of admissibility for the matters contained in paragraph 5. Moreover, trial defense counsel did not address Appellant's claim in their written declarations, so we have no insight into their strategy and tactics. We do not know whether they thought the affidavit contained improper evidence or was not proper rebuttal but chose not to object, or did not recognize any potential impropriety at all.

With no explanation for counsel's actions, we move to the question of whether trial defense counsel's advocacy fell measurably below that performance ordinarily expected of fallible lawyers. *See Gooch*, 69 M.J. at 362. Addressing whether paragraph 5 was a proper matter in rebuttal, the Government argues that the "discussion regarding mission impact was proper rebuttal evidence since the Defense opened the door to discuss Appellant's impact on the workplace environment." Addressing whether paragraph 5 was improper aggravation evidence, the Government argues "direct mission impact because of Appellant's crimes (*i.e.*, the fact he and [ ] RL had been taken out of the unit due to his misconduct) was fair game under R.C.M. 1001(b)(4), and Appellant provides no authority holding otherwise." Appellant did not address this point in his reply brief.

"[T]he function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party," and its scope is "defined by evidence introduced by the other party." *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992)) (internal quotation marks and citations omitted). In his character letter, SMSgt ND touched on Appellant's work performance, including before and after he moved to a different duty section, and Appellant's resilience and rehabilitative potential. Paragraph 5 of the paralegal's affidavit touched on the effect "this case" had on good order and discipline, Appellant's move to a different duty section, RL taking time off work, and others "pick[ing] up the workload." Paragraph 5 did little if anything to rebut the character letter.

The content in paragraph 5, however, was not improper evidence in aggravation. The affidavit was not clear about what part of "the case" had an "impact on good order and discipline." SMSgt ND did not cast blame on Appellant for the leadership decision to move him to another workplace, and even praised

Appellant's performance after the move.[8] More so than this move, it appears SMSgt ND believed RL's absence from the workplace affected the unit. A victim's absence from work due to an accused's offense is proper evidence in aggravation.[9]

Assuming trial defense counsel should have identified that paragraph 5 was outside the scope of rebuttal or contained improper aggravation and therefore should have objected to Prosecution Exhibit 6, we address whether there is a reasonable probability that, absent the error, there would have been a different result. We find it highly unlikely this evidence swayed the military judge to adjudge a harsher sentence. We start with the presumption that the military judge knew and followed the law. *See United States v. Bridges*, 66 M.J. 246, 248 (C.A.A.F. 2008) (citations omitted). To the extent paragraph 5 of this exhibit could be construed to contain improper evidence, the military judge would have disregarded that interpretation. Moreover, paragraph 5 was not particularly inflammatory; "it was what most fact-finders would assume to be the effect on the unit when a service member is identified as an offender [of another member of the unit] and removed from the duty section." *United States v. Key*, 55 M.J. 537, 539 (A.F. Ct. Crim. App. 2001) (citation omitted). Finally, the Government's other evidence in aggravation—particularly the stipulation of fact detailing Appellant's crimes—was very strong. We find that even if trial defense counsel were ineffective in not objecting to Prosecution Exhibit 6, there is no reasonable probability that, absent the error, there would have been a different result.

### c. Trial Counsel's Presentencing Argument

Appellant asserts that trial defense counsel failed to object to improper argument presented by trial counsel. Appellant specifies two portions: where trial counsel stated Appellant did not acknowledge the number of times he strangled RL, and where trial counsel asked the military judge to provide justice for the victim. Reading these arguments in context, we find no error.

---

[8] Indeed, a leadership decision to move an accused or a victim to a different workplace, and the consequences thereof, are not matters in aggravation when they are not "directly and immediately resulting from the accused's offense." *See* R.C.M. 1001(b)(4); *cf. United States v. Key*, 55 M.J. 537, 538–39 (A.F. Ct. Crim. App. 2001) (finding evidence showing appellant was moved from the position of trust he used to make fake identification cards was a direct result of his crimes and therefore was proper aggravation).

[9] Proper matters for consideration on sentence include "the impact of the offense" on "the financial, social, psychological, or medical well-being of any victim of the offense" as well as "the mission, discipline, or efficiency of the command of the accused and any victim of the offense." R.C.M. 1002(f)(2)(A)–(B).

Turning first to the stipulation of fact, Appellant agreed he strangled RL "at least five separate times." Regarding the details of these incidents, Appellant stipulated to some underlying facts, but more so stipulated to how witnesses would testify about the incidents and Appellant's statements to them about strangling RL. When asked by the military judge, Appellant agreed and admitted the content in the paragraphs of the stipulation of fact were "accurate," "true," or both.

In the providence inquiry, Appellant told the military judge he strangled RL "on one or more occasion[s]" and "[b]oth times it was unlawful" and "[b]oth times it was done with force."

In argument on sentence, trial counsel stated:

> But 18 months is reasonable because of his lack of remorse and low rehabilitation potential. *He didn't even acknowledge the number of times that he strangled her*. And this shows his low rehabilitation potential. A person can't rehabilitate from something if he can't even acknowledge that it happened.

(Emphasis added).

We find this was fair comment on the evidence. While Appellant agreed in writing that he strangled RL "at least five separate times," he orally admitted only two instances to the military judge. Trial counsel highlighted this discrepancy for a lawful purpose: to make argument regarding Appellant's rehabilitation potential. *See* R.C.M. 1002(f)(3)(F) (in determining an appropriate sentencing, the court-martial should consider the need for the sentence to rehabilitate the accused).

Trial counsel also stated in argument on sentence:

> [RL] will have to deal with what he did to her for the rest of her life. *Your sentence can't undo the harm he caused but your sentence can provide her some justice and can protect society and other young friends of the accused from future harm at his hands, at least for 18 months*. This sentence needs to teach him that laying hands on someone in such a violent and repetitive manner is never an adequate solution for such minor perceived relationship slights.

(Emphasis added). Appellant argues this portion of trial counsel's argument "was highly improper because there was no evidence presented that [Appellant] harmed anyone else or that he was a danger to be a recidivist."

In effect, trial counsel argued for a just sentence and one that would deter Appellant from repeating his crimes. We find this was fair argument. Trial counsel may argue for a sentence that will "provide just punishment for the

offense," "promote adequate deterrence of misconduct," and "protect others from further crimes by the accused." R.C.M. 1002(f)(3)(C)–(E).

Maj AB "did not find any arguments made by trial counsel to be particularly offensive or harmful when viewed in the totality of the argument." We agree, and find Appellant has not met his burden to show trial defense counsel should have objected to trial counsel's arguments.

### d. Trial Defense Counsel's Sentencing Argument

Appellant asserts that trial defense counsel put "minimal thought and effort" into his sentencing argument. Appellant characterizes it as "an anemic argument" that "provided minimal adequacy on behalf of [Appellant]." Specifically, he states:

> Trial defense counsel spent a brief section of the argument giving a bare bones recitation of [Appellant's] background and an incoherent explanation of things [Appellant] had already suffered. There was nothing else—no context or explanation for what happened, and no mention of the specifics from character letters and other pieces of evidence that demonstrate why [Appellant] has rehabilitation potential. And most importantly, no effort to rebut the extreme caricature of [Appellant] that trial counsel laid out in its argument.

The written declarations of Appellant's trial defense counsel on this issue are generally consistent. They fault Appellant for not providing them more information from which to present and argue mitigation. Maj AB stated:

> The defense sentencing argument was appropriate given the context and limited sentencing package we had to work with in this case. [Appellant] was reminded constantly to provide our paralegal with names of individuals who could provide letters or testify. Defense counsel stepped in to emphasize the lack of material with [Appellant], who appeared to not be concerned with the state of his mitigation material. The context was important because the acts were particularly aggravating, given the use of a firearm. Our strategy was to accept responsibility and not appear to create excuses or blame something for [Appellant's] actions.

In presentencing, the Government presented a summary of Appellant's personal data, Appellant's enlisted performance reports, and a letter of reprimand and an administrative demotion action relating to the dirt-bike accident. The Defense presented documents consisting of military and family photos, two character letters, and Appellant's written unsworn statement. Appellant also

delivered an oral unsworn statement. In rebuttal, the Government presented Prosecution Exhibit 6, the affidavit regarding SMSgt ND discussed *supra*.

Trial defense counsel's argument on sentence was concise. The argument highlighted (1) Appellant's remorse; (2) Appellant taking responsibility for his crimes and pleading guilty; (3) Appellant's age, background, and upbringing; (4) character letters and enlisted performance reports; (5) other consequences of Appellant's actions, including cancellation of his selection for promotion, demotion in rank, the TBI, and permanent disfigurement; and (6) the lack of need for further deterrent measures. He argued against a bad-conduct discharge and for no more than six months of confinement.

We do not agree with Appellant that trial defense counsel's sentencing argument was "incoherent" or "presented next to nothing to warrant leniency from the military judge." Appellant has identified no other specific error, only how the argument could have been improved. We find Appellant has not met his burden to show that in presenting argument, trial defense counsel's performance was substandard.

### e. Advice on Request for Clemency

In his written declaration, Appellant asserts the following:

> I waived clemency based on the advice of my trial defense counsel. I was advised that the convening authority was legally barred from providing me relief. Based on that advice, I waived my clemency rights. I later found out that the convening authority was not barred from granting clemency on my rank reduction. If I had known that, I would not have waived clemency and submitted matters for consideration to include information on my background along with context for what was going on in my life at that time.

Appellant does not name the defense counsel who provided him that advice.

In their declarations, Appellant's trial defense counsel state that Maj RC advised Appellant of his post-trial rights. Maj RC states:

> As to the issue of clemency, the waiver was made with the consultation, consent, and at the direction of [Appellant]. [Appellant] was made fully aware of the limits on the convening authority's power to grant clemency, including the power to provide relief on rank reduction. Given the nature of the original charges, the plea agreement (which the Defense secured primarily through the Victims' Counsel and was begrudgingly supported by the Staff Judge Advocate's office), the sentence, and the unlikelihood of success in clemency [Appellant] waived his

right to submit matters for the Convening Authority's consideration.

Appellant and Maj RC each signed Appellate Exhibit XXIV, a Post-Trial and Appellate Rights Advisement, on 10 June 2021—five days before Appellant pleaded guilty and was sentenced. Paragraph 14 of the document explains the limits of the convening authority's clemency powers. In relevant part, Paragraph 14.b states:

> Finally, the Convening Authority may reduce, commute, or suspend the following punishments imposed by a court-martial: (1) total confinement of less than or equal to six months, if the total sentence to be served is less than or equal to six months; (2) restriction; (3) forfeitures and fines; (4) reduction in grade; (5) hard labor without confinement; and (6) a reprimand. R.C.M. 1109(c).

Above his signature, Maj RC certified that he explained the rights contained in the Post-Trial and Appellate Rights Advisement to Appellant and fully counseled Appellant "both orally and in writing" concerning the rights and procedures contained therein. Above his signature, Appellant stated, "I have read and understand my post-trial and appellate rights, as stated above."

Before the military judge began deliberations on sentence, he ascertained that Maj RC provided Appellant his post-trial and appellate rights orally and in writing, "including the rights contained in Rule for Courts-Martial 1010." With a copy of Appellate Exhibit XXIV in front of Appellant, both Appellant and Maj RC affirmed their signatures were on the document. The military judge then confirmed with Appellant that Maj RC explained his post-trial and appellate rights to him. He also ascertained that Appellant had no questions about those rights.

Shortly after the court-martial adjourned, Appellant signed receipt of a memo signed by a trial counsel titled "Submission of Matters to the Convening Authority." This memo advised Appellant, *inter alia*, as follows:

> Since you have been convicted and sentenced by court-martial, you have the right to submit matters for consideration by the convening authority of your court-martial before the convening authority decides what, if any, action the convening authority will take on your case. The matters you submit may include any matters that might affect the convening authority's decision to approve or disapprove findings of guilt or part of the sentence in your case as permitted by law.

The memo advised Appellant that he had ten days to submit matters, specifically providing a deadline of 25 June 2021 at 1600. Appellant acknowledged receipt of the memo with his signature on 15 June 2021 at 1546—36 minutes

after the court-martial had adjourned. Appellant also indicated that he waived his right to submit matters and would not be submitting matters for the convening authority's consideration.

The requirement for defense counsel's advisement of an accused's post-trial and appellate rights to be addressed on the record is captured in R.C.M. 1010:

> [P]rior to adjournment, the military judge shall ensure that defense counsel has informed the accused orally and in writing of:
>
> (a) The right to submit matters to the convening authority to consider before taking action;
>
> . . . .
>
> (d) The right to the advice and assistance of counsel in the exercise of the foregoing rights or any decision to waive them.
>
> The written advice to the accused concerning post-trial and appellate rights shall be signed by the accused and defense counsel and inserted in the record of trial as an appellate exhibit.

Our reading of the Post-Trial and Appellate Rights Advisement and the Submission of Matters to the Convening Authority memoranda convince us to reject Appellant's assertion that he was advised clemency relief was impossible, and not just improbable. *See Ginn*, 47 M.J. at 248 ("[I]f the affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the [c]ourt may discount those factual assertions and decide the legal issue.") Appellant acknowledged in writing that he understood the post-trial rights in the memo he and Maj RC signed, which included the right to submit matters to the convening authority and the convening authority's ability to provide relief in sentencing, including relief on adjudged reduction in grade. Appellant told the military judge that Maj RC explained to him those rights, both orally and in writing, and affirmed that he had no questions about those rights.

This inquiry is not an empty ritual. We expect that if Maj RC had advised Appellant orally that the convening authority was powerless to affect his sentence—contrary to the guidance in Post-Trial and Appellate Rights Advisement—Appellant would ask for clarification when the military judge provided Appellant that specific opportunity. Appellant did not seek any clarification about his post-trial rights. Appellant has not met his burden to show that trial defense counsel's performance was constitutionally deficient.

**B. Traumatic Brain Injury**

Appellant contends that the "military judge erred when he failed to conduct a further inquiry into the providence of [Appellant's] guilty plea when [Appellant] stated in his unsworn statement that he suffered from TBI." We disagree.

**1. Law**

When an accused pleads guilty and does not assert a defense, "if he sets up matter raising a possible defense, then the military judge is obligated to make further inquiry to resolve any apparent ambiguity or inconsistency." *United States v. Phillippe*, 63 M.J. 307, 310 (C.A.A.F. 2006) (citation omitted). Lack of mental responsibility is an affirmative defense. *See United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F. 2007); R.C.M. 916(k)(1).

> Once the military judge has accepted a plea as provident and has entered findings based on it, an appellate court will not reverse that finding and reject the plea unless it finds a substantial conflict between the plea and the accused's statements or other evidence of record. A "mere possibility" of such a conflict is not a sufficient basis to overturn the trial results.

*Shaw*, 64 M.J. at 462 (quoting *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996)).

In *Shaw*, the United States Court of Appeals for the Armed Forces (CAAF) considered whether the appellant's reference in his unsworn statement to a psychological condition set up matter raising a possible defense or presented only a mere possibility of a defense. 64 M.J. at 462. The court found the latter. It noted that "there was no factual record developed during or after the trial substantiating [the a]ppellant's statement or indicating whether and how [the psychological condition] may have influenced his plea," and that the appellant's "conduct during the plea inquiry [did not] raise concerns that might have suggested to the military judge that [the a]ppellant lacked the capacity to plead" *Id.* at 462–63. Additionally, the appellant "ha[d] not asserted, nor [did] his statement reflect, that he was unable to appreciate the nature and quality or wrongfulness of his acts as a result of a mental disease or defect." *Id.* at 463.

When the matter does not clearly indicate a defense, "the military judge may reasonably rely on both a presumption that the accused is sane and the long-standing principle that counsel is presumed to be competent." *Id.* at 463 (citing *Cronic*, 466 U.S. at 658) (additional citation and footnote omitted). "[W]hen the accused is presenting his sentencing statement through or with the assistance of counsel, the military judge may properly presume, in the absence of any indication to the contrary, that counsel has conducted a reasonable investigation into the existence of the defense." *Id.*

### 2. Additional Background and Analysis

In his declaration to this court, Appellant states that he "suffered a head injury and was diagnosed with traumatic brain injury (TBI)" following an accident riding his dirt bike while intoxicated. He also states he "eventually received treatment for [his] alcohol abuse." Appellant also highlights Prosecution Exhibits 4 and 5, which comprise a letter of reprimand and administrative demotion action both based on Appellant driving the dirt bike while intoxicated and without proper protective equipment and training.

Appellant attached to his declaration "four pages from [his] medical and mental health records" and attested to their authenticity.[10] These pages confirm Appellant's accident and injuries to his head. The discharge summary indicates referral to neurosurgery was not necessary. A neurosurgery office note has a reference to a discharge summary that stated Appellant was "being transferred to inpatient rehab for further management of his TBI" following his discharge from the hospital. A neurology office note indicates Appellant complained of "[s]emi-short term memory." This note also states Appellant had experienced "some issues with headaches" brought on with a change in position and "associated fuzziness;" an issue with his eye that resolved after two weeks; and "some issues with loss of hearing and tinnitus."

Appellant has not demonstrated that he had a condition that would constitute a defense involving mental responsibility. He has not provided support for his contention that a TBI causes—or his TBI caused—partial or full lack of mental responsibility or "influenced his plea." *See United States v. Falcon*, 65 M.J. 386, 392 (C.A.A.F. 2008) (citing *Shaw*, 64 M.J. at 462).

All indications in the record point to Appellant being fully sane at his court-martial. Moreover, Appellant had the assistance of two defense counsel, who themselves had the assistance of an expert forensic psychiatrist. Against this backdrop, and with the limited information Appellant gave the military judge in his unsworn statement, the military judge could "properly presume" Appellant's defense team "conducted a reasonable investigation into the existence of the defense." *See Shaw*, 64 M.J. at 463. We find the military judge did not err by not reopening the providence inquiry to explore the defense of lack of mental responsibility.

---

[10] Each of the four pages appears to be the first page of a multi-page entry.

**C. Providence of Guilty Plea to Specification 2 of Charge II**

**1. Additional Background**

On 5 March 2021, the convening authority referred two charges to trial by general court-martial. Among the referred charges, Specification 2 of Charge II alleged the following:

> In that AIRMAN FIRST CLASS KRISTOPHER D. COLE, United States Air Force, 355th Aircraft Maintenance Squadron, Davis-Monthan Air Force Base, Arizona, did within the state of Arizona, between on or about 1 September 2019 and on or about 28 September 2019, assault [RL] by pointing an unloaded firearm at her head.

Appellant submitted to the convening authority an Offer for Plea Agreement, dated 14 June 2021, which states in pertinent part:

> 1. I, [Appellant], am presently the accused under court-martial charges, dated 9 December 2020. I have read the charges and specifications alleged against me, and they have been explained to me by my defense counsel, [Maj RC] and [Maj AB]. I understand the Charges and Specifications, and I am aware I have a legal and moral right to plead not guilty. . . .
>
> . . . .
>
> 4. . . . I assert that I am, in fact, guilty of the offenses to which I am offering to plead guilty, and I understand that this agreement permits the [G]overnment to avoid presentation in court of sufficient evidence to prove my guilt. . . .
>
> 5. In making this offer, I state that:
>
>> a. I am satisfied with my defense counsel who have advised me with respect to this offer and consider them competent to represent me in this court-martial.
>>
>> . . . .
>>
>> d. My counsel fully advised me of the nature of the charges against me, . . . and I fully understand her [sic] advice and the meaning, effect, and consequences of this plea.

Appellant and both his trial defense counsel signed the PA on 13 June 2021. After Appellant's signature and before the signatures of his defense counsel is a statement which includes the following: "I certify I gave the accused the advice referred to above. I explained to him the elements of the offenses." The convening authority approved and accepted the PA on 14 June 2021.

22

Appellant's trial was conducted on 15 June 2021.[11] Appellant pleaded guilty in accordance with the PA, including to Specification 2 of Charge II.

Prosecution Exhibit 1 is a stipulation of fact, dated 15 June 2021, signed by Appellant, his two trial defense counsel, and the three trial counsel. Under the heading, "*Assault with an Unloaded Firearm (Article 128, UCMJ)*," paragraph 25 reads:

> On or about 21 September 2019, the Accused pointed an un-loaded firearm at [RL's] head, touching her temple. He had no legal justification or excuse for doing so. He did so with force and violence. [RL] did not consent to his action.

The military judge read this paragraph to Appellant substantially verbatim. He asked Appellant if it was "accurate" and whether he "wish[ed] to admit that it is," to which Appellant responded, "Yes, Your Honor."[12]

In the providence inquiry into Appellant's plea of guilty, the military judge advised Appellant as follows:

> Let's move on to Specification 2 of Charge II. That specification is, again, a violation of Article 128 of the Uniform Code of Military Justice. The elements of that offense, *which is called assault consummated by battery*, are, one, that between on or about 1 August 2019 and on or about 20 January 2020,[13] within the state of Arizona, you did assault [RL] by offering to do bodily harm to her. Two, that you did so by pointing at her with a certain weapon, to wit, an unloaded firearm. Three, that you intended to do bodily harm and four, that the weapon was a dangerous weapon.

(Emphasis added).

The military judge defined "assault," "offer to do bodily harm," "bodily harm," and "unlawful":

> An assault is an unlawful offer made with force or violence to do bodily harm to another, whether or not the offer consummated. An offer to do bodily harm is an unlawful demonstration of violence by an intentional act or omission which creates in the mind

---

[12] The military judge conducted such a colloquy with Appellant on all 37 paragraphs in the stipulation of fact.

[13] The charged dates of this offense are between on or about 1 September 2019 and on or about 28 September 2019. Appellant does not assert error, and we find no prejudice.

of another, a reasonable apprehension of receiving immediate bodily harm. . . . Bodily harm means an offensive touching of another, however slight. . . . . And the offer to do bodily harm is unlawful if done without legal justification or excuse and without the lawful consent of the victim.

. . . .

Firearm means any weapon which is designed to or may be readily converted to expel any projectile by the action of an explosive. A victim may not lawfully consent to an assault with a dangerous weapon. Consent is not a defense to this offense.

The military judge also provided definitions or other instructions on "intent to do bodily harm" and "dangerous weapon." Next, the military judge received Appellant's acknowledgment that his "plea of guilty admits that these elements accurately describe what [Appellant] did" and that Appellant "believe[s] and admit[s] that the elements and definitions taken together correctly describe what [Appellant] did."

After the military judge asked Appellant to tell him why he was guilty, Appellant responded:

Between on or about 1 September 2019 and on or about 28 September 2019, at my off base residence in Tucson, Arizona, myself, [RL] and others were cleaning guns together. During the night, *I pointed a firearm at [RL]*. This was done *unlawfully* and *I did not have legal purpose* to do so. *While the firearm was unloaded* and had the firing pin removed, which means it could not have been fired, I was wrong, and *it was illegal for me to point a firearm at her*. It was *violent because I believe [RL] did not want me to point the firearm at her and it would have scared her. [RL] did not consent to me doing this* and I apologize for my actions.

(Emphasis added).

The military judge then briefly asked Appellant follow-up questions. First, the military judge asked Appellant about the location of the offense. He then asked and Appellant responded whether the firearm was a dangerous weapon (yes), whether pointing the gun at RL as he did was bodily harm (yes), whether he had any legal justification or excuse (no), and whether he intended to point the firearm at RL (yes). The military judge then verified Appellant said the offense happened in September 2019. Finally, in response to the military judge's question, trial counsel and defense counsel each stated they did not believe any further inquiry was required for this specification.

The military judge found Appellant's guilty pleas provident and found Appellant guilty in accordance with his pleas.

### 2. Law

"The providence of a plea is based not only on the accused's understanding and recitation of the factual history of the crime, but also on an understanding of how the law relates to those facts." *United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) (citation omitted). "[A]n accused has a right to know to what offense and under what legal theory he or she is pleading guilty." *Id.*

"[W]e review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea de novo." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). "In doing so, we apply the substantial basis test, looking at whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *Id.*; *see also United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004) ("[I]n evaluating the providency of a plea, the entire record should be considered.") An appellant bears the burden of establishing the military judge abused his discretion in accepting a guilty plea. *United States v. Phillips*, 74 M.J. 20, 21–22 (C.A.A.F. 2015).

> In order to ensure a provident plea, the military judge must "accurately inform [the a]ppellant of the nature of his offense and elicit from him a factual basis to support his plea." "An essential aspect of informing Appellant of the nature of the offense is a correct definition of legal concepts. The judge's failure to do so may render the plea improvident." However, "an error in advising an accused does not always render a guilty plea improvident. Where the record contains factual circumstances that objectively support the guilty plea to a more narrowly construed statute or legal principle, the guilty plea may be accepted."

*United States v. Finch*, 73 M.J. 144, 148 (C.A.A.F. 2014) (quoting *Negron*, 60 M.J. at 141).

In *Negron*, the CAAF considered the providence of a guilty plea to depositing obscene materials in the mail where it concluded the military judge provided the appellant an erroneous definition of "obscene" relating to that offense. *Negron*, 60 M.J. at 141–42. Compounding the error, the military judge's inquiry failed to establish a factual basis for the appellant's plea, specifically whether the appellant's conduct met a correct definition of obscene. *Id.* at 142. Moreover, "the military judge almost exclusively resorted to leading questions," resulting in the appellant merely "parroting" responses and the military judge "extract[ing] little relevant factual information" from the appellant. *Id.* at 142–43.

In assessing the providence on a guilty plea, we consider an appellant's "colloquy with the military judge, as well any inferences that may reasonably be drawn" from it. *United States v. Carr*, 65 M.J. 39, 41 (C.A.A.F. 2007) (citation omitted). Generally, appellate courts accept the parties' trial-level stipulated facts as true. *See United States v. Castro*, 81 M.J. 209, 211–12 (C.A.A.F. 2021).

The elements of simple assault in violation of Article 128, UCMJ, are: "(a) That the accused attempted to do or offered to do bodily harm to a certain person; (b) That the attempt or offer was done unlawfully; and (c) That the attempt or offer was done with force or violence." *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(1). The President has authorized a higher maximum punishment when a simple assault is committed with an unloaded firearm. *See MCM*, pt. IV, ¶ 77.d.(1) (limiting the maximum punishment for simple assault to confinement for three months, partial forfeitures for three months, and no punitive discharge; but, when an unloaded firearm is used, authorizing up to three years in confinement, total forfeitures, and a dishonorable discharge).

### 3. Analysis

Appellant submits that his plea of guilty to Specification 2 of Charge II was "not knowing, intelligent, and voluntary." Specifically, he asserts "[h]e could not have been certain if he was pleading guilty to the charged offense of simple assault or those erroneously identified by the military judge: assault consummated by a battery or aggravated assault with a dangerous weapon." The Government asserts that Appellant pleaded guilty to, and was convicted of, simple assault with an unloaded firearm as alleged in Specification 2 of Charge II. We find Appellant entered a plea of guilty to simple assault with an unloaded firearm as charged in Specification 2 of Charge II, and the military judge did not abuse his discretion in accepting Appellant's guilty plea thereto.

The charge sheet, pretrial agreement, stipulation of fact, and Appellant's admission of facts to the military judge under oath convince us Appellant knew the offense alleged in Specification 2 of Charge II to which he was pleading guilty. The language of the charge sheet provides notice of a simple assault with an unloaded firearm. The pretrial agreement was signed before the military judge provided Appellant instructions on the elements, and states Appellant's defense counsel explained the elements of the offenses to him. In the stipulation of fact, the heading of paragraphs 25–31 is most telling: "*Assault with an Unloaded Firearm (Article 128, UCMJ)*." This section indicates that Appellant was accused of an offer-type assault with an unloaded firearm. For example, paragraph 29 states, "[RL] did not know that [Appellant] had pulled the firing pin out of the firearm, and she truly thought he might pull the trigger and kill her." In paragraph 25 of the stipulation, Appellant admits he "pointed

an unloaded firearm at [RL's] head, touching her temple," that he "had no legal justification or excuse for doing so," and that he "did so with force and violence" and without RL's consent.

While the military judge stated two "elements" and definitions[14] unrelated to the offense of simple assault with an unloaded firearm, the military judge did explain to Appellant the required elements and related definitions. As relates to the first element—that Appellant offered to do bodily harm to a certain person—the military judge stated, "[O]ne . . . you did assault [RL] by offering to do bodily harm to her" and also that "[b]odily harm means an offensive touching of another, however slight." As relates to the second element—that the offer was done unlawfully—the military judge stated, "[T]he offer to do bodily harm is unlawful if done without legal justification or excuse and without the lawful consent of the victim." As relates to the second element, as well as the third element—that the offer was done with force or violence—the military judge stated "[a]n assault is an unlawful offer made with force or violence to do bodily harm to another, whether or not the offer consummated" and "[a]n offer to do bodily harm is an unlawful demonstration of violence by an intentional act or omission which creates in the mind of another, a reasonable apprehension of receiving immediate bodily harm." As relates to the sentence aggravator—that the simple assault was committed with an unloaded firearm—the military judge stated, "Two, that you did so by pointing at [RL] with a certain weapon, to wit, an unloaded firearm."

Appellant's providence inquiry established the elements of simple assault with an unloaded firearm. After the military judge asked Appellant to tell him why he was guilty, Appellant addressed the accurate elements only. He stated he "pointed a firearm at [RL];" that he did so "unlawfully," without a "legal purpose to do so," and "it was illegal for [him] to point a firearm at her;" and "[i]t was violent" because "[RL] did not want [him] to point the firearm at her and it would have scared her." Appellant did not explain to the military judge that he intended to do bodily harm or that the firearm was a dangerous weapon.[15]

---

[14] The military judge added: "Three, that you intended to do bodily harm and four, that the weapon was a dangerous weapon."

[15] However, Appellant did agree with the military judge that "the elements and definitions taken together correctly describe[d]" what Appellant did; the unloaded firearm—"a 9mm Smith and Wesson"—was "a dangerous weapon under the definitions" he provided; and that Appellant did "intend to point the gun at her." This "parroting" of the military judge's leading questions with a "yes" or "no" answer contributed little to the factual record. *See Negron*, 60 M.J. at 143.

We conclude that the military judge did not abuse his discretion in accepting Appellant's plea to the charged offense and had no basis for rejecting it. We reach this conclusion notwithstanding the military judge's errors in indicating that Appellant was charged with the offense of assault consummated by a battery and in advising and conducting a colloquy on matters that were not part of the charged offense. The stipulated facts plus the providence inquiry sufficiently established a factual basis for Appellant's plea. Appellant has not met his burden to show a substantial basis to question his plea to Specification 2 of Charge II. *See Phillips*, 74 M.J. at 21–22.

## D. Sentencing

We next consider whether the military judge misapprehended the offense in Specification 2 of Charge II for which he sentenced Appellant and, if so, whether Appellant is entitled to relief. Appellant suggests "[t]he fact that the military judge had [Appellant] establish some of the elements of the wrong crime not only call[s] into question which crime [Appellant] was sentenced for but whether the military judge unfairly increased the aggravating nature of the charged offense."

### 1. Law

The sentencing authority must consider, among other things, "the nature and circumstances of the offense." Article 56(c)(1)(A), UCMJ, 10 U.S.C. § 856(c)(1)(A); R.C.M. 1002(f)(1). If the sentencing authority misapprehended the nature and circumstances of the offense, including erroneous consideration of aggravating factors, we ask whether the error "substantially influence[d] [the a]ppellant's adjudged sentence." *United States v. Edwards*, 82 M.J. 239, 247 (C.A.A.F. 2022) (citations omitted).

The maximum period of confinement for simple assault with an unloaded firearm is three years. *See MCM*, pt. IV, ¶ 77.d.(1)(b). The maximum period of confinement for aggravated assault with a dangerous weapon is eight years. *See MCM*, pt. IV, ¶ 77.d.(3)(a).

### 2. Additional Background and Analysis

The Government asserts the military judge understood the nature of the offense and, even if he did not, Appellant suffered no prejudice. Appellant asserts he "was certainly prejudiced at the sentencing phase of his court-martial because of the military judge's errors since the elements of aggravated assault with a deadly weapon include aggravating factors such as a dangerous weapon and intent to cause bodily harm." We find no prejudice.

The record does not indicate that the military judge considered extra aggravating factors during sentencing. The military judge was well aware that the firearm Appellant used was unloaded and therefore could not be used to

inflict death or grievous bodily harm on RL, as demonstrated in this portion of the providence inquiry:

> [Military Judge]: [T]he *unloaded* firearm, it was a 9mm Smith and Wesson, I believe in the stipulation of fact, it stated, and I wanted to ask you if you consider that a dangerous weapon under the definitions I have given you?
>
> [Appellant]: Yes, Your Honor.
>
> [Military Judge]: Do you believe that you had any legal justification or excuse for pointing the gun at [RL]?
>
> [Appellant]: No, Your Honor.

(Emphasis added).

Contrary to Appellant's assertion on appeal, the military judge did not ask Appellant during the providence inquiry whether he intended to cause bodily harm:

> [Military Judge]: Would you agree that pointing the gun at her and stating what you stated was bodily harm under the definition I gave you?
>
> [Appellant]: Yes, Your Honor.
>
> [Military Judge]: And my other question is, did you *intend to point the gun at her*?
>
> [Appellant]: Yes, Your Honor.

(Emphasis added). The military judge elicited from Appellant that his offer to do bodily harm to RL was by pointing the firearm at her. These facts were pertinent to the elements of simple assault with an unloaded firearm.

After he discussed the offenses with Appellant, the military judge asked trial counsel what they "calculate[d] to be the maximum punishment authorized by law in this case based solely on [Appellant's] guilty plea." Trial counsel responded, "Six years and six months," and trial defense counsel agreed. The military judge noted this answer did not include any other sentence elements. He then asked whether "counsel agree[d] that a dishonorable discharge, six years, six months of confinement, reduction to the lowest enlisted grade and total forfeitures [were] authorized as the maximum punishment in this case." Counsel for both parties agreed.

In sentencing argument, trial counsel did not repeat the military judge's errors from the providence inquiry. Trial counsel argued that Appellant relied on the fact that RL did not know the firearm was unloaded and the firing pin had been removed when he put it to RL's head to motivate her to go faster.

Trial counsel did not argue the firearm was a dangerous weapon, or that Appellant intended to do bodily harm to RL, or that Appellant committed an aggravated assault.

Likewise, the military judge did not make additional statements that could be inconsistent with a finding of guilty to simple assault with an unloaded firearm. On the contrary, when ascertaining the maximum punishment based on the offenses to which Appellant pleaded guilty, the military judge agreed with counsel that the maximum period of confinement was six years and six months, well below the maximum period of eight years solely for the offense of aggravated assault. We find that while the military judge made errors during his providence inquiry with Appellant, such errors did not substantially influence Appellant's adjudged sentence.[16] The military judge did not impose a sentence for an offense more serious than Appellant was charged with committing.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[16] The statement of trial results and entry of judgment—both signed by the military judge—correctly record the offense code to be reported to the Defense Incident-Based Reporting System (DIBRS) as "128-A1" for simple assault with an unloaded forearm. A DIBRS code is neither a finding nor part of a sentence, *see United States v. Lepore*, 81 M.J. 759, 762–63 (A.F. Ct. Crim. App. 2021) (en banc), but is instructive on the issue at hand.